IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

DEMETRIOS STAVRAKIS,
*Defendant*.

Civil No. ELH-23-2058
Criminal No. ELH-19-0160

## MEMORANDUM OPINION

This Memorandum Opinion addresses a petition for post-conviction relief filed by defendant Demetrios Stavrakis.

In a Second Superseding Indictment issued on June 6, 2019 (ECF 94), a Grand Jury in the District of Maryland charged Demetrios ("Jimmy") Stavrakis with using fire to commit a federal felony, in violation of 18 U.S.C. § 844(h)(1) (Count One); two counts of wire fraud, in violation of 18 U.S.C. § 1343 (Counts Two, Three); and one count of malicious destruction of real property by fire, in violation of 18 U.S.C. § 844(i) (Count Four).[1]  At trial, which began on September 9, 2019 (ECF 149), the government presented evidence that on July 29, 2015, Stavrakis, the sole owner of Adcor Industries, Inc. ("Adcor") in Baltimore, aided and abetted the arson of a structure that housed Adcor and related businesses.  As a result of the fire, Stavrakis obtained about $15 million in insurance proceeds.

During the trial, the government called more than 50 witnesses.  Ten witnesses testified during the defendant's case, and three witnesses testified during the government's rebuttal case.

---

[1] Defendant was charged with each offense pursuant to 18 U.S.C. § 2, which provides, in part:  "Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

1

Approximately 700 exhibits were introduced into evidence. On October 24, 2019, the jury convicted defendant on all counts. ECF 226.

Stavrakis, who is self-represented, has filed a "Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 18 U.S.C. Section 2255." ECF 406 ("Petition"). He has also asked the Court to appoint a lawyer to represent him in connection with the Motion. ECF 405 ("Motion"). The government opposes the Petition. ECF 416 ("Opposition"). Defendant has replied. ECF 419 ("Reply"). Defendant has also filed two supplements to his Reply (ECF 420; ECF 421), along with a request for discovery in connection with the Petition. ECF 425 ("Discovery Request").[2]

No hearing is necessary to decide the Petition and Motion. *See* Local Rule 105.6. For the reasons that follow, I shall deny the Petition, the Motion, and the Discovery Request.

## I.    Procedural Background

Stavrakis was initially indicted on March 28, 2019. ECF 1. The Second Superseding Indictment was returned on June 6, 2019. ECF 94. It is the operative charging document.

As noted, defendant proceeded to a jury trial that began on September 9, 2019. ECF 149. On October 15, 2019, after the close of the government's case, defendant filed a motion for judgment of acquittal. ECF 206. Defendant renewed the motion at the close of his case. *See* ECF 229 at 1. Trial concluded on October 24, 2019, when the jury returned a verdict of guilty on all charges. ECF 216; ECF 226 (verdict).

On November 12, 2019, Stavrakis filed, through counsel, a renewed "Motion for Judgment of Acquittal Under Rule 29 and for New Trial Under Rule 33." ECF 229 ("Motion for Acquittal").

---

[2] In a separate submission, defendant has also moved for compassionate release under 18 U.S.C. § 3582(c)(1)(A). ECF 399. In that matter, the Court has appointed counsel for the defendant. *See* ECF 429; ECF 434. The matter is not yet ripe, however. This Memorandum Opinion concerns only the post-conviction Petition and Motion for appointment of counsel.

By Memorandum Opinion (ECF 247) and Order (ECF 248) of February 7, 2020, I denied the Motion for Acquittal.

Sentencing was held on February 12, 2020. ECF 251. By statute, Count One carried a mandatory penalty of ten years, consecutive to any other term of imprisonment. And, Count Four required a mandatory minimum term of imprisonment of five years. Counts Two and Three carried statutory maximums of twenty years. *See* ECF 257 (Amended Presentence Report or "PSR"), ¶ 87. Pursuant to the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G."), Counts Two, Three, and Four were grouped. *See* U.S.S.G. § 3D1.2(b). Defendant had a final offense level of 33, and a Criminal History Category of I. ECF 257, ¶¶ 63, 67. His Guidelines range for those counts was 135 months to 168 months of incarceration. *Id.* ¶ 88. In addition, and as noted, Count One required a ten-year consecutive sentence. Therefore, based on the required sentences for Counts One and Four, defendant faced a minimum sentence of fifteen years of imprisonment.

After a lengthy sentencing hearing, I sentenced defendant to the required minimum term of fifteen years of imprisonment. ECF 255.[3] In particular, I sentenced defendant to concurrent terms of five years of imprisonment with respect to Count Two (wire fraud), Count Three (wire fraud), and Count Four (malicious destruction of real property by fire). *Id.* at 1–2. And, I sentenced defendant to ten years of imprisonment with respect to Count One (use of fire to commit a federal felony), consecutive to his sentences with respect to Counts Two, Three, and Four. *Id.* at 2. I also sentenced defendant to a three-year term of supervised release. *Id.* at 3.

As to restitution, I deferred making a determination as to whether and in what amount defendant owed restitution pursuant to the Mandatory Victims Restitution Act, 18 U.S.C.

---

[3] The government sought a sentence of 22 years. *See* ECF 240 (gov't. sentencing memo), at 1; ECF 312 (Transcript, 2/12/20), at 81.

3

§§ 3663A, 3664. *See* ECF 262 at 2. Instead, I set a restitution hearing for April 7, 2020. ECF 252. On February 25, 2020, the government submitted a "Consent Motion for Restitution," asking the Court to enter an order of restitution in the amount of $15,525,602.55. ECF 262. The Court granted the Consent Motion for Restitution. ECF 263. An Amended Judgment issued on February 25, 2020. ECF 264.

Defendant noted an appeal to the Fourth Circuit. ECF 266. In a 19-page unreported opinion issued on February 24, 2022 (ECF 395-1), the Fourth Circuit affirmed defendant's judgment of conviction. ECF 395; *see United States v. Stavrakis*, 2022 WL 563242 (4th Cir. Feb 24, 2022) (Harris, J.). The Court subsequently denied defendant's request for a rehearing *en banc*. ECF 397. The Court's mandate issued on April 13, 2022. ECF 398. Thereafter, on September 2, 2022, defendant filed a petition for certiorari with the Supreme Court. *See Stavrakis v. United States*, No. 22-205. The Supreme Court denied the petition on October 11, 2022. *See id.*

On July 28, 2023, defendant filed the Petition (ECF 406) and the Motion. ECF 405.

## II.    Factual Summary[4]

At the relevant time, Adcor manufactured parts for beverage and aerospace companies, the defense industry, and the military. Adcor was also a federal firearms licensee. Adcor operated from a two-story property on South Haven Street in Baltimore City. The building is a large structure bordered, in part, by Gough and Grundy Streets. In addition to Adcor, the building houses

---

[4] The factual summary derives from my Memorandum Opinion of February 7, 2020 (ECF 247), in which I addressed defendant's Motion for Acquittal. ECF 229. At that time, trial transcripts were not yet available. As noted in the Memorandum Opinion, I prepared the summary primarily on the basis of my notes from trial as well as the parties' submissions.

In its opinion of February 24, 2022, the Fourth Circuit observed that my opinion of February 7, 2020 (ECF 247) "sets out in detail the extensive evidence at trial" and therefore it "recount[ed]" the evidence "only briefly" in its opinion. *See* ECF 395-1 at 5.

related business entities owned by the defendant. I shall refer to these entities collectively as "Adcor."[5] The building itself is owned by TJ Enterprises, LLC, which is also owned by the defendant.

The building contains a secured area, known as the Gun Room. The building also contains a large machine shop and warehouse, with several bay doors for trucks. Within the warehouse is an enclosed office known as the DNC Hut.

At trial, Special Agent Lisa Herb of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") explained that The National Fire Protection Association ("NFPA") lists four classifications of fire: accidental (*e.g.*, pot on stove); natural (*e.g.*, lightening); undetermined; and incendiary, *i.e.*, arson. As to arson, the NFPA identifies six motives: vandalism, excitement, crime concealment, revenge, profit, and extremism.

A fire occurred at Adcor in the early morning hours of July 29, 2015. It is undisputed that the fire at Adcor was an arson. However, no direct evidence was adduced to establish that the defendant was the torch. Rather, the government's case was largely circumstantial.

Jose Romero was on Grundy Street in the early morning of July 29, 2015. He saw smoke coming from the building at approximately 1:30 a.m. and called 911. The Baltimore City Fire Department promptly responded, and the fire was extinguished by approximately 1:50 a.m. No one was injured.

The fire originated in the area of the building known as the DNC Hut, which measures approximately ten feet by twelve feet in size. Little of value was stored in the DNC Hut. After

---

[5] At trial, Michael Young, a certified public accountant and partner at a public accounting firm, testified that Adcor has been a client of the accounting firm since 2006. He explained that the defendant owned 100% of Adcor. And, Adcor owned 100% of three other businesses and had a 50% ownership interest in another.

the fire, a five gallon can of methanol, in charred condition, was found in the DNC Hut. It was undisputed that the methanol was used to ignite the fire. Prior to the fire, that can of methanol had been stored in the beverage shipping area of the Adcor warehouse. Notably, it was used on a limited basis by shop foreman William "Bud" Kuhrmann. It was the only can of methanol stored at Adcor.

Although the fire was confined to the DNC Hut, other parts of the premises experienced substantial smoke and water damage. As a result of the damages, Adcor's insurer, Travelers Indemnity Company of America ("Travelers"), paid out over $15 million in insurance benefits on the claim.

There are two glass doors at the front or main entrance to Adcor. There was no sign of forced entry into the Adcor building. Nor was anything of value taken from the premises at the time of the fire.

All Adcor employees were provided with a Brivo security card that operated a magnetized lock on the front door, located below a deadbolt lock. Each card was linked to a unique number assigned to that employee. An Adcor employee could swipe his or her security card to unlock the front door with the Brivo card. If the swipe card was used to enter the building, a record was made that reflected the identity of the person who swiped in with the Brivo card, as well as the date and time of use of the Brivo card.

The front door could also be opened with a key to the deadbolt lock, which was located towards the top of the door. But, only certain employees had a key. The defendant, as the CEO of Adcor, was one of them.

The front doors were also equipped with a security alarm, for which an alarm keypad was located nearby. That keypad was one of three for the entire building. The keypad was used to arm

6

and disarm the alarm by way of a four-digit code.  An entrant had a 30-second grace period to disarm the system.

In July 2015, the employees who knew the alarm code all shared the same alarm code.  The defendant knew the alarm code.  Each user of the alarm code was identified as "User 3" in the alarm records. The areas of the building covered by the alarm were designated as "partitions."  The front lobby area, adjacent to the glass doors, was called Partition One.  The warehouse was designated as Partition Two.

Betsy Robak joined Adcor in May 2009.  She worked in accounting.  On July 28, 2015, Robak left the building at 5:51:08 p.m.  On that day, she was the last office employee to leave Adcor, other than the defendant.  Mr. Stavrakis had asked Robak to join him for dinner at the Blue Hill Tavern, a restaurant in Baltimore that he co-owned.  Although Ms. Robak had worked at Adcor since 2009, the two had never had dinner alone until that night.  She had, however, previously been to the Blue Hill Tavern with the defendant as part of a group of Adcor employees.

At the time of the fire, Adcor had eleven security cameras.  The government introduced video surveillance evidence obtained from Adcor security camera No. 1, which showed the defendant at Adcor's main entrance doors on July 28, 2015, about one minute after Robak left the building.  In particular, the video showed the defendant putting tape on the latch of the front door before he set the security alarm.

At 5:52 p.m., after applying the tape, the defendant set the security alarm by using the alarm keypad near the front doors.  He then exited the building through the main doors.  However, he returned a few seconds later.  He entered by pulling open the front door without swiping his Brivo security card.  In other words, by taping the door, the defendant defeated a security feature that would have identified the person opening the door.  He then turned off the security alarm.  At 5:53

p.m., the defendant applied additional tape to the same area of the front door. Then, he activated the alarm for a second time, at 5:54 p.m., and left the building for the night.

Several Adcor witnesses testified that they were unfamiliar with any problem with Adcor's front entrance doors that would cause difficulty in being able to set the alarm. Others testified to the contrary. *See*, *e.g.*, ECF 232-1. But, there was no testimony at all concerning any prior use of tape to fix any issue with Adcor's front entrance doors.

According to the evidence, office personnel generally were not responsible for activating the alarm at the end of the work day. Rather, the nightshift supervisor was responsible for doing so. Therefore, when Mr. Stavrakis left the building on the evening of July 28, 2015, it was unusual that he activated the alarm. And, when the defendant left the Adcor premises on July 28, 2015, two machinists were on the shop floor. They were working the 3:00 p.m. to 11:00 p.m. shift.

Edward Thomas, one of those employees, had been asked to close the building on the night of July 28, 2015. At about 5:00 p.m., he noticed the defendant looking out of an interior office window, which overlooked the shop area. At about 7:00 p.m., after the lights had been turned off in the office area, Thomas entered the lobby of the office area, near the front doors, with the intention of ensuring that the front doors were secured. To his surprise, he set off the motion detector that covered much of the lobby area.[6] The activation of the alarm was documented by records for the security system. Having set off the alarm, Thomas disarmed it at 7:02 p.m. To do so, he used the keypad near the front doors. He then rearmed the office, designated as Partition One. However, he did not arm the shop area, designated as Partition Two, until he and his coworker left the building for the night. They exited through a shop door. The system recorded their time of departure as 11:16 p.m. The building was then dark.

---

[6] Because of a masking feature, Security Camera 1 did not capture the entire lobby area.

There is no record of a swipe card having been used to enter through the front doors of the Adcor building on the morning of July 29, 2015, prior to the fire. Nor was there any video surveillance footage of anyone entering the building through the front lobby doors prior to the fire. But, at 12:25 a.m. on that date, Partition One was disarmed. The shop floor, Partition Two, was disarmed several minutes later, at 12:33 a.m.

Anthony J. Cianferano, Jr., a Baltimore City firefighter, was one of the first responders to arrive at the scene. He arrived at Adcor between 1:40 a.m. and 1:45 a.m. He testified that the lights were on in the hall/foyer as he approached the two front doors from the inside of the building.

The defendant was notified of the fire while he was at home. He arrived at Adcor just before 3:00 a.m. on July 29, 2015. His cell phone did not link him to the Adcor premises at the time of the fire.

After the defendant learned of the fire, one of the first calls he made, at approximately 4:11 a.m., was to Randolph ("Randy") Goodman, a public adjuster with whom the defendant was familiar.[7] Mr. Goodman is a principal with the firm Goodman-Gable-Gould/Adjusters International ("GGG"). According to the evidence, a public adjuster helps navigate the insurance claim process and assists an insured in maximizing the insured's recovery in accordance with the terms of the applicable insurance policy. As noted, Adcor was insured through Travelers.

Special Agent Herb was notified of the fire by Detective Michael Reno of the Baltimore City Police Department ("BPD").[8] Reno arrived at Adcor at about 2:00 a.m. on July 29, 2015. Agent Herb arrived at Adcor at about 4:00 a.m. Among other things, she spoke with the defendant,

---

[7] The Court did not permit the government to introduce evidence of a fire in 2007 at another building associated with the defendant, for which a substantial insurance claim was paid, and with respect to which Mr. Goodman assisted the defendant.

[8] Reno retired from the BPD in June 2019, after 25 years of service.

9

who was already at the scene.  In response to Herb's inquiry, the defendant identified two former, disgruntled employees, one of whom was Michael Brown.

The defendant did not disclose to Agent Herb that he had taped the front door that night because it was malfunctioning.  Moreover, there was no evidence that anyone other than the defendant knew of the tape on the front door.  Yet, as of 4:39 a.m., there was no tape on Adcor's front entry door, as reflected in a photograph of the front door that Agent Herb took at that time.

Agent Herb asked Adcor senior employee Michael Hyatt to provide video surveillance for a 24-hour period surrounding the fire.  Hyatt began working at Adcor in 1997, at the age of 19. By 2015, he held the position of Vice President and was regarded as a senior officer.  He was also in charge of "IT."  And, he is a close associate of the defendant.

During the day on July 29, 2015, Detective Reno watched surveillance video footage that appeared to depict a human figure igniting the fire.  And, on the afternoon of July 29, 2015, Hyatt furnished a disk with the video surveillance to law enforcement.  It covered the period from 4:00 a.m. on July 28, 2015, through 8:00 a.m. on July 29, 2015.  Agent Herb did not review the video at that time, however.  And, it was later determined that the disk did not contain footage of activity at the front doors or lobby between 12:25 a.m. and 12:33 a.m. on July 29, 2015.  There was also a gap in footage for Security Camera 1 from 6:00 p.m. on July 28, 2015, to 2:00 a.m. on July 29, 2015.  Therefore, the video did not depict employee Thomas setting off the security alarm at about 7:00 p.m. on July 28, 2015.

As of July 30, 2015, neither Travelers nor law enforcement had requested production of the actual hard disk drives.  A few days after the fire, Travelers requested the actual hard disk drives.  But, Adcor was unable to produce the two hard disk drives that stored the relevant video surveillance footage, as requested by Travelers.  According to Hyatt, on July 30, 2015, the server

crashed, so he replaced the hard disk drives and left the old ones on a table near the server, located in a second-floor office. But, they were never found. The cleaning and restoration crews working at Adcor denied disposing of any Adcor property.

The parties stipulated that Travelers recovered 10 hard disk drives from an office area of Adcor on September 11, 2015. They were "loose," that is, they were "not currently installed in any server or computer." *See* Government Trial Exhibit 120.

On Monday, August 3, 2015, while Hyatt was on vacation with his family at a beach in North Carolina, ATF Task Force Officer ("TFO") Dexter Hodges asked Hyatt for the hard disk drives. And, on August 6, 2015, TFO Hodges showed up at Hyatt's beach place, without having told Hyatt that he would do so.

ATF Specialist Steve Greene, a digital forensic analyst, was received as an expert. He opined that if the hard disk drives had been available for inspection, he would be able to determine if any files had been deleted.

James McKinnies, a Certified Fire Investigator and Special Agent with ATF, took numerous photographs at Adcor on April 3, 2019. He also inspected the roof hatch by gaining access to the roof through the kitchen on the second floor. He noted that there is no handle on the outside of the hatch, *i.e.*, on the roof side.

Eric Huzzy, an insurance restoration contractor, was at Adcor on several occasions, beginning soon after the fire. He photographed the roof hatch and also noted that the access handle is located on the interior of the hatch, inside the building.

Douglas Fisher, a Fire Protection Engineer with more than two decades of experience, visited Adcor on August 3, 2015, and again on August 28, 2015, on behalf of Travelers. Among other things, he examined Adcor's security and surveillance systems. The company did not have

a fire suppression system.  By the time Fisher returned to Adcor in late August of 2015, Adcor's front doors had been replaced.  Moreover, those doors, which had supposedly malfunctioned on July 28, 2015, had been discarded.  And, according to Fisher, only two of Adcor's eleven security cameras were damaged due to the fire.  *See* Government Trial Exhibits FE 32 and FE 35.

Michael Brown joined Adcor in 2000.  Brown's wife, his father, and his two sons also worked at Adcor at varying times.  They all left employment with Adcor on the same date in September 2013.  The departure was not amicable.

After the fire, the defendant implicated Brown by way of statements he made to Agent Herb and TFO Hodges.  Similarly, Fisher attended an interview of the defendant on August 28, 2015, and noted that the defendant discussed Brown and his wife and referenced a disparaging matter involving Ms. Brown.  And, Goodman testified that the defendant told him that a disgruntled employee named Brown may have started the fire.

Mr. Brown and his wife both testified for the government.  Electronic evidence showed that Mr. Brown was at his home at the time of the fire.  And, Brown denied any wrongdoing.

According to Brown, he developed about 30 patents that are owned by Adcor.  Brown also explained that, from approximately 2005 to 2010, Adcor made upper receivers for Colt's M-4 weapons.

Brown recounted that he had been close with the defendant for many years.  But, by the time of Brown's departure in 2013, his relationship with the defendant had deteriorated.  In fact, in 2014, the defendant sued Brown, claiming Brown misappropriated intellectual property that belonged to Adcor.  The case eventually settled.

Further, Brown testified that at 2:19 a.m. on July 29, 2015, he learned of the fire from the police.  He recalled that he went to the scene later in the day, because he and his family were going

to dinner in that area for his son's birthday.  He also claimed that until September 2019, he was unaware of any rumors concerning his wife's alleged indiscretion with an Adcor employee.  It was one of the prosecutors who told him of the "rumor."

Brown was familiar with the roof hatch at Adcor.  He maintained that it could not be opened from the outside.

According to the government's evidence, consisting of records and the testimony of numerous witnesses, Adcor suffered total operating losses of over $7.6 million between 2011 and June 2015, and from January to June 2015, it had a six-month operating loss of $718,679.13. Moreover, Adcor was repeatedly in default as to various loans, necessitating forbearance agreements with several lenders at varying times, including M&T Bank; JOCO Financial, LLC; 1st Mariner Bank; and Bank of America.  Adcor employees and suppliers testified that between 2012 and July 2015, Adcor also failed to make timely payments to several of its suppliers.

The defendant personally borrowed over $5 million, and used some of the money to repay loan obligations.  To satisfy debt obligations, Adcor also sold its valuable Beverage Division, which was profitable, to Adcor Packaging Group, of which the defendant owned only 50%.  And, the evidence suggested serious concerns as to Adcor's viability.

As noted, two of Adcor's surveillance cameras had been damaged during the fire.  Hyatt testified that the defendant asked him to obtain bids for Adcor's security system.  Hyatt obtained a bid from Strat Security, which Hyatt described as "a little bit of an upgrade."  The defendant personally met with Strat Security about the bid.  Hyatt sent the bid from Strat Security to Goodman via email on September 14, 2015, and copied the defendant on the email.  In the email, Hyatt asked "how to proceed."  He testified that he was not aware that the bid he sent to Goodman would be forwarded to Travelers.

Travelers conducted an Examination Under Oath ("EUO") of the defendant on October 21, 2015. The transcript was read to the jury and a short excerpt of the audio was played. At the EUO, the defendant claimed that the "throat was broke" on the front door when he left the building on July 28, 2015. For that reason, he taped it. Mr. Stavrakis explained that he set the alarm but he then disarmed the alarm because it was not properly set, and then he rearmed it. Further, he stated that he happened to have the tape with him because he was doing grout work at home.[9]

Ultimately, Travelers paid approximately $15 million on the Adcor insurance claim. The insurance money was used to replace several old machines at Adcor with new, state of the art equipment that cost almost $2 million. In addition, the defendant transferred about $600,000 to an account in his wife's name. The money was used to pay off private loans procured before the fire. And, the defendant made several purchases of personal property between August and December of 2015, such as a BMW for almost $53,000; a Harley-Davidson motorcycle for Adcor employee Bud Kuhrmann for $25,500; a Mercedes-Benz sport utility vehicle for almost $100,000; a men's $15,000 watch for Adcor's second in command, employee Mike Hyatt; a ladies' diamond ring for $12,500; and a men's watch for $7,800.

Additional facts are discussed, *infra*.

### III.    Legal Standard

Section 2255(a) of Title 28 of the United States Code provides relief to a prisoner in federal custody only on specific grounds: "(1) 'that the sentence was imposed in violation of the Constitution or laws of the United States,' (2) 'that the court was without jurisdiction to impose

---

[9] As noted, the video showed that the defendant taped the door before attempting to arm the alarm. And, when the defendant re-entered the building, he was able to open the door without swiping his Brivo card.

such a sentence,' (3) 'that the sentence was in excess of the maximum authorized by law,' and (4) that the sentence 'is otherwise subject to collateral attack.'" *See Hill v. United States*, 368 U.S. 424, 426-27 (1962) (citing 28 U.S.C. § 2255); *see also United States v. Hodge*, 902 F.3d 420, 426 (4th Cir. 2018); *United States v. Newbold*, 791 F.3d 455, 459 (4th Cir. 2015); *United States v. Pettiford*, 612 F.3d 270, 277 (4th Cir. 2010).

Relief under § 2255 is meant to remedy fundamental constitutional, jurisdictional, or other errors.  It is reserved for situations in which failure to grant relief "'inherently results in a complete miscarriage of justice.'"  *United States v. Addonizio*, 442 U.S. 178, 185 (1979) (quoting *Hill,* 368 at 428).

Under § 2255, the petitioner must establish (1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law so fundamental as to render the entire proceeding invalid.  *Moss v. United States*, 323 F.3d 445, 454 (6th Cir. 2003).  But, "an error of law does not provide a basis for collateral attack unless the claimed error constituted 'a fundamental defect which inherently results in a complete miscarriage of justice.'"  *Addonizio*, 442 U.S. at 185 (quoting *Hill*, 368 U.S. at 428).  In order to prevail on a § 2255 motion, a defendant bears the burden of proving his grounds for collateral relief by a preponderance of the evidence.  *See Jacobs v. United States*, 350 F.2d 571, 574 (4th Cir. 1965).

The scope of collateral review under § 2255 is narrower than on appeal, and a "'collateral challenge may not do service for an appeal.'" *Foster v. Chatman*, 578 U.S. 488, 519 (2016) (Alito, J., concurring) (quoting *United States v. Frady*, 456 U.S. 152, 165 (1982)).  "Accordingly, at least as a general rule, federal prisoners may not use a motion under 28 U.S.C. § 2255 to relitigate a claim that was previously rejected on direct appeal."  *Foster*, 578 U.S. at 519 (citing, *inter alia*, *United States v. Roane*, 378 F.3d 382, 397 n.7 (4th Cir. 2006)).  Indeed, "it is well-settled that [a

defendant] cannot 'circumvent a proper ruling . . . on direct appeal by re-raising the same challenge in a § 2255 motion.'" *United States v. Dyess*, 730 F.3d 354, 360 (4th Cir. 2013) (quoting *United States v. Linder*, 552 F.3d 391, 396 (4th Cir. 2009)) (ellipsis in *Dyess*); *see United States v. Caro*, 733 F. App'x 651, 659 (4th Cir. 2018) (same).

In addition, a failure to raise a claim on direct appeal constitutes a procedural default that bars presentation of the claim in a § 2255 motion, unless the petitioner can demonstrate "cause and actual prejudice resulting from the errors of which he complains," or "actual innocence." *Pettiford*, 612 F.3d at 280 (citing *United States v. Mikalajunas*, 186 F.3d 490, 492–93 (4th Cir. 1999)); *see United States v. Green*, 67 F.4th 657, 666 (4th Cir. 2023); *Bousley v. United States*, 523 U.S. 614, 621 (1998) ("Habeas review is an extraordinary remedy and will not be allowed to do service for an appeal.") (internal quotations and citations omitted); *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *see also Dretke v. Haley*, 541 U.S. 386, 393 (2004); *Reed v. Farley*, 512 U.S. 339, 354 (1994) (stating that "the writ is available only if the petitioner establishes 'cause' for the waiver and shows 'actual prejudice resulting from the alleged violation.'"); *Finch v. McKoy*, 914 F.3d 292, 298 (4th Cir. 2019) (discussing requirements for a claim of actual innocence); *Linder*, 552 F.3d at 397.

Generally, the rule governing procedural default of claims brought under § 2255 precludes consideration of any contentions that "'could have been but were not pursued on direct appeal, [unless] the movant . . . show[s] cause and actual prejudice resulting from the errors of which he complains.'" *Pettiford*, 612 F.3d at 280 (quoting *Mikalajunas*, 186 F.3d at 492–93). Under the "cause and prejudice" standard, the petitioner must show: (1) cause for not raising the claim of error on direct appeal; and (2) actual prejudice from the alleged error. *Bousley*, 523 U.S. at 622; *see Dretke*, 541 U.S. at 393; *Massaro v. United States*, 538 U.S. 500, 505 (2003); *see also Reed*,

512 U.S. at 354 (stating that "the writ is available only if the petitioner establishes 'cause' for the waiver and shows 'actual prejudice resulting from the alleged violation.'"); *Carrier*, 477 U.S. at 496; *Frady*, 456 U.S. at 167-68.

In order to show cause for not raising the claim of error on direct appeal, a petitioner must prove that "some objective factor external to the defense such as the novelty of the claim or a denial of effective assistance of counsel" impeded their counsel's efforts to raise the issue earlier. *Coleman v. Thompson*, 501 U.S. 722, 753 (1991); *see Carrier*, 477 U.S. at 492 ("[C]ause . . . requires a showing of some external impediment preventing counsel from constructing or raising the claim."); *Mikalajunas*, 186 F.3d at 493 (movant must demonstrate "something external to the defense, such as the novelty of the claim or a denial of effective assistance of counsel"). Additionally, the alleged error cannot simply create a possibility of prejudice, but must be proven "*actual* and substantial disadvantage" that "infect[s]" the petitioner's "entire trial with error of constitutional dimensions." *Frady*, 456 U.S. at 170 (emphasis in original). Pursuant to the Supreme Court's ruling in *Carrier*, 477 U.S. at 494, prejudice does not support relief of a procedural default in the absence of a showing of cause. *See also Engle v. Isaac*, 456 U.S. 107, 134 n.43 (1982).

The actual innocence exception "only applies in limited circumstances." *United States v. Jones*, 758 F.3d 579, 583 (4th Cir. 2014). Indeed, it must be "an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent . . . ." *Carrier*, 477 U.S. at 496.

In order to show "actual innocence," the petitioner "must demonstrate actual factual innocence of the offense of conviction, *i.e.*, that petitioner did not commit the crime of which he was convicted; this standard is not satisfied by a showing that a petitioner is legally, but not

17

factually, innocent." *Mikalajunas*, 186 F.3d at 494 (citing *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992)); *see also Bousley*, 523 U.S. at 623. Notably, the petitioner must meet this burden by clear and convincing evidence. *Mikalajunas*, 186 F.3d at 494. In other words, a "petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Jones*, 758 F.3d at 583; *see Bousley*, 523 U.S. at 623.

As the Fourth Circuit has said, "[a] valid actual innocence claim 'requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence— that was not presented at trial.'" *Finch*, 914 F.3d at 298 (quoting *Schlup v. Delo*, 513 U.S. 298, 324 (1995)). Moreover, a petitioner must "'demonstrate that the totality of the evidence would prevent any reasonable juror from finding him guilty beyond a reasonable doubt, such that his incarceration is a miscarriage of justice.'" *Finch*, 914 F.3d at 298 (quoting *Teleguz v. Pearson*, 689 F.3d 322, 329 (4th Cir. 2012)). It is an "exacting standard," based on a "'holistic judgment about all the evidence'. . . ." *Finch*, 914 F.3d at 299 (quoting *House v. Bell*, 547 U.S. 518, 539 (2006)).

However, failure to raise on direct appeal a claim of ineffective assistance of counsel is not regarded as procedurally defaulted. *Massaro*, 538 U.S. at 509; *see United States v. Faulls*, 821 F.3d 502, 507–08 (4th Cir. 2016). Indeed, such claims ordinarily are not litigated on direct appeal. Claims of ineffective assistance are cognizable on direct appeal "only where the record conclusively establishes ineffective assistance." *United States v. Baptiste*, 596 F.3d 214, 216 n.1 (4th Cir. 2010). Rather, such claims are usually litigated in a § 2255 action to allow for development of the record. *Massaro*, 538 U.S. at 504-06; *United States v. Ladson*, 793 F. App'x 202 (4th Cir. Feb. 12, 2020) (per curiam).

18

Moreover, a self-represented litigant is generally "held to a 'less stringent standard' than is a lawyer, and the Court must liberally construe his claims, no matter how 'inartfully' pled." *Morrison v. United States*, RDB-12-3607, 2014 WL 979201, at *2 (D. Md. Mar. 12, 2014) (internal citations omitted); *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (stating that claims of self-represented litigants are held "to less stringent standards than formal pleadings drafted by lawyers"); *Quintero v. Garland*, 998 F.3d 612, 634 (4th Cir. 2021) (same); *Bala v. Commonwealth of Virginia Dep't of Conservation & Recreation*, 532 F. App'x 332, 334 (4th Cir. 2013) (per curiam) (same).

Pursuant to 28 U.S.C. § 2255(b), the court must hold an evidentiary hearing "[u]nless the motion and the files and records conclusively show that the prisoner is entitled to no relief . . . ." *United States v. Mayhew*, 995 F.3d 171, 176 (4th Cir. 2021); *see United States v. LeMaster*, 403 F.3d 216, 220–23 (4th Cir. 2005); *United States v. White*, 366 F.3d 291, 302 (4th Cir. 2004). Ordinarily, a district court has discretion as to whether to hold a hearing, but "a hearing is required when a movant presents a colorable Sixth Amendment claim showing disputed facts beyond the record, or when a credibility determination is necessary to resolve the claim . . . ." *Mayhew*, 995 F.3d at 176-77. If the district court "denies relief without an evidentiary hearing," the appellate court will "construe the facts in the movant's favor." *United States v. Akande*, 956 F.3d 257, 261 (4th Cir. 2020); *see also United States v. Turner*, 841 F. App'x 557, 559 (4th Cir. 2021) (same).

In my view, no hearing is necessary here.

## IV.    Discussion

Defendant asserts seventeen grounds for post-conviction relief. *See* ECF 406. Eight of these grounds concern instances of alleged prosecutorial misconduct. *See id.* at 6–7; 8; 8–10; 11–12; 14–15; 27–30; 30–31; 31–32. Five grounds concern alleged ineffective assistance of counsel.

*See id.* at 7; 21–22; 26–27; 27; 33.  Two grounds concern "newly discovered evidence" that, in defendant's view, establishes his "actual innocence."  *See id.* at 11; 16.  One ground concerns an alleged "due process violation," *id.* at 22, and one ground concerns an alleged "improper jury instruction."  *Id.* at 32 (capitalization omitted).

I shall address defendant's claims for relief according to the legal theory asserted, rather than in the order they are presented in the Petition.  I begin by considering defendant's claims of ineffective assistance of counsel.

### A.  Ineffective Assistance of Counsel

### 1.  The Legal Standard

The Sixth Amendment to the Constitution guarantees a criminal defendant the right to the effective assistance of competent counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *see also Buck v. Davis*, 580 U.S. 100, 118 (2017); *United States v. Ductan*, 800 F.3d 642, 648 (4th Cir. 2015). Ineffective assistance of counsel is a well recognized basis for collateral relief. *See generally Missouri v. Frye*, 566 U.S. 133 (2012); *Lafler v. Cooper*, 566 U.S. 156 (2012); *Padilla v. Kentucky*, 559 U.S. 356 (2010).

To mount a successful challenge under 28 U.S.C. § 2255 based on ineffective assistance of counsel, a petitioner must satisfy the two elements set forth in *Strickland*, 466 U.S. at 687–88; *see Williams v. Taylor*, 529 U.S. 362, 390 (2000); *United States v. Sutherland*, 103 F.4th 200, 207–08 (4th Cir. 2024); *United States v. Palacios*, 982 F.3d 920, 923 (4th Cir. 2020); *Akande*, 956 F.3d at 260; *United States v. Winbush*, 922 F.3d 227, 229 (4th Cir. 2019); *United States v. Hall*, 771 F. App'x 226, 227 (4th Cir. 2019) (per curiam); *United States v. Carthorne*, 878 F.3d 458, 465 (4th Cir. 2017); *United States v. Powell*, 850 F.3d 145, 149 (4th Cir. 2017). First, the petitioner must show that counsel's performance was deficient.  Second, the petitioner must show that he was

prejudiced by the deficient performance. *Strickland*, 466 U.S. at 687; *see Buck*, 580 U.S. at 118; *Chaidez v. United States*, 568 U.S. 342, 348 (2013); *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000); *Hill v. Lockhart*, 474 U.S. 52, 57 (1985); *Winbush*, 922 F.3d at 229; *Powell*, 850 F.3d at 149; *United States v. Rangel*, 781 F.3d 736, 742 (4th Cir. 2015); *Dyess*, 730 F.3d at 361; *Richardson v. Branker*, 668 F.3d 128, 139 (4th Cir. 2012); *United States v. Higgs*, 663 F.3d 726, 735 (4th Cir. 2011); *see also United States v. Richardson*, 820 F. App'x 225, 226 (4th Cir. 2020) (per curiam); *United States v. Baker*, 719 F.3d 313, 318 (4th Cir. 2013). The petitioner must prove his claim by a preponderance of the evidence. *Mayhew*, 995 F.3d at 176; *Pettiford*, 612 F.3d at 277.

The first *Strickland* prong, known as the "performance prong," relates to professional competence. The petitioner must demonstrate that his attorney's performance fell "below an objective standard of reasonableness," as measured by "prevailing professional norms." *Strickland*, 466 U.S. at 688; *see Harrington v. Richter*, 562 U.S. 86, 104 (2011); *Sutherland*, 103 F.4th at 207–08; *Richardson*, 820 F. App'x at 225; *Powell*, 850 F.3d at 149; *Hall*, 771 F. App'x at 227. The central question is whether "an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Richter*, 562 U.S. at 88 (quoting *Strickland*, 466 U.S. at 690).

The Supreme Court has recognized that the "first prong sets a high bar." *Buck*, 580 U.S. at 118; *see also Powell*, 850 F.3d at 149. In *Padilla*, the Court stated, 559 U.S. at 371: "Surmounting *Strickland's* high bar is never an easy task." "'*Strickland* does not guarantee perfect representation, only a reasonably competent attorney.'" *Cox v. Warden*, 102 F.4th 663, 675 (4th Cir. 2024) (quoting *Harrington*, 562 U.S. at 110) (cleaned up). Notably, a "lawyer has discharged his constitutional responsibility so long as his decisions fall within the 'wide range of professionally

competent assistance.'" *Buck*, 580 U.S. at 118 (citation omitted). Consequently, the performance prong is "'difficult'" to establish. *Lawrence v. Branker*, 517 F.3d 700, 709 (4th Cir. 2008) (quoting *James v. Harrison*, 389 F.3d 450, 457 (4th Cir. 2004)).

To satisfy the high bar, the burden is on the petitioner to establish "'that counsel made errors so serious that his "counsel" was not functioning as the "counsel" guaranteed by the Sixth Amendment.'" *Richter*, 562 U.S. at 88 (quoting *Strickland*, 466 U.S. at 687). Notably, "the *Strickland* standard must be applied with scrupulous care," because "the standard of judging counsel's representation is a most deferential one." *Richter*, 562 U.S. at 105; *see United States v. Morris*, 917 F.3d 818, 823 (4th Cir. 2019). Indeed, "[k]eenly aware of the difficulties inherent in evaluating counsel's performance, the Supreme Court has admonished that courts 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Lawrence*, 517 F.3d at 708 (quoting *Strickland*, 446 U.S. at 689); *see Cullen v. Pinholster*, 563 U.S. 170, 189 (2011); *Richter*, 562 U.S. at 104; *Richardson*, 820 F. App'x at 225-26; *Lee v. Clarke*, 781 F.3d 114, 122 (4th Cir. 2015). There, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689.

Under the second *Strickland* prong, known as "the prejudice prong," the petitioner must show that his attorney's deficient performance "prejudiced [his] defense." *Strickland*, 466 U.S. at 687. To satisfy the "prejudice prong," a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694; *see also Buck*, 580 U.S. at 119; *Lafler*, 566 U.S. at 163; *Lockhart v. Fretwell*, 506 U.S. 364, 369–70 (1993). "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceedings. *Strickland*, 466 U.S. at 687; *see Thornell v. Jones*, 602 U.S. ___, ___, 144 S. Ct. 1302, 1310 (2024) (death penalty case). However, a petitioner is

not entitled to post-conviction relief based on prejudice where the record establishes that it is "not reasonably likely that [the alleged error] would have made any difference in light of all the other evidence of guilt." *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).

A court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697. Nor must a court address both components if one is dispositive. *Jones v. Clarke*, 783 F.3d 987, 991 (4th Cir. 2015). This is because failure to satisfy either prong is fatal to a petitioner's claim. As a result, "there is no reason for a court . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697.

The two-pronged test articulated in *Strickland* also applies to claims of ineffective assistance of appellate counsel. *See Smith v. Robbins*, 528 U.S. 259, 285 (2000) (stating that "the proper standard for evaluating [the] claim that appellate counsel was ineffective . . . is that enunciated in *Strickland v. Washington* . . . ."); *Smith v. Murray*, 477 U.S. 527, 535–36 (1986). "In applying this test to claims of ineffective assistance of counsel on appeal . . . reviewing courts must accord appellate counsel the 'presumption that he decided which issues were most likely to afford relief on appeal.'" *Bell v. Jarvis*, 236 F.3d 149, 164 (4th Cir. 2000) (quoting *Pruett v. Thompson*, 996 F.2d 1560, 1568 (4th Cir. 1993)).

Notably, "[c]ounsel is not obligated to assert all nonfrivolous issues on appeal, as '[t]here can hardly be any question about the importance of having the appellate advocate examine the record with a view to selecting the most promising issues for review.'" *Bell*, 236 F.3d at 164 (quoting *Jones v. Barnes*, 463 U.S. 745, 752); *see also Smith v. South Carolina*, 882 F.2d 895, 899 (4th Cir. 1989). In *Barnes*, 463 U.S. 745, the Supreme Court said, *id.* at 751–52: "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker

arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." Indeed, "[t]his process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith*, 477 U.S. at 536 (quoting *Barnes*, 463 U.S. at 751–52); *see also Smith*, 882 F.2d at 899 (counsel's failure to raise a weak constitutional claim may constitute an acceptable strategic decision designed "to avoid diverting the appellate court's attention from what [counsel] felt were stronger claims").

### 2. Discussion

As noted, defendant has identified five purported instances of ineffective assistance of counsel. *See* ECF 406 at 7; 21–22; 26–27; 27; 33. For the reasons that follow, I conclude that defendant has not established that he received ineffective assistance of counsel in violation of the Sixth Amendment. I note as a general matter that throughout the life of this case, including at trial, defendant's multiple attorneys advocated diligently and thoughtfully on his behalf. And, none of the purported instances of ineffective assistance, considered individually or together, provide a plausible basis for relief.

Defendant claims, first, that trial counsel provided ineffective assistance by failing to object to certain questions posed by the prosecutor to ATF Specialist Greene regarding surveillance footage taken from Adcor's security cameras. *Id.* at 7. The questioning about which defendant complains occurred on direct examination, as follows, ECF 292 (Trial Transcript, 9/17/19), at 290–91:

> [PROSECUTOR]: The individual DVD that was provided to law enforcement, were you able to determine exactly how that DVD was created, just from examining the contents of the DVD?
>
> [WITNESS]: No.

24

[PROSECUTOR]: Would you be able to tell from that DVD if there were files that had been deleted prior to the DVD being created?

[WITNESS]: No.

[PROSECUTOR]: Would you be able to tell just from examining that DVD if there were files that were not selected in order to be copied to that DVD?

[WITNESS]: No.

[PROSECUTOR]: Or if there were places where there was just simply no file in the first place, therefore, nothing to copy or create on to the DVD? Correct?

[WITNESS]: Yes. Correct.

Defendant suggests that the jury likely understood ATF Specialist Greene's answer to the final question in this series—"Yes. Correct"—as an affirmation that "there were places [on Adcor's server] where there was just simply no file in the first place." ECF 406 at 6. And, in defendant's view, such an affirmation "erroneously le[d] the jury to believe there was a cover-up" related to the absence of video footage of the arsonist's entry. *Id.* at 7.

I am unpersuaded that defense counsel was ineffective in light of "prevailing professional norms." *Strickland*, 466 U.S. at 690. It is clear from the context that, by answering "Yes" to the final question in the series, ATF Specialist Greene affirmed that he would *not* "be able to tell just from examining the DVD . . . .if there were places where there was just simply no file in the first place." ECF 292 (Trial Transcript, 9/17/19), at 290–91. I cannot discern any reason why counsel should have objected to such an affirmation.

Moreover, even assuming that ATF Specialist Greene affirmed that "there were places where there was just simply no file in the first place," *id.* at 291, it does not follow that the jury was "erroneously le[d] . . . to believe there was a cover-up." ECF 406 at 7. Indeed, the proposition that "there were places where there was just simply no file in the first place," ECF 292 (Trial Transcript, 9/17/19), at 291, is consistent with defendant's argument that the lacunae in the

surveillance footage were due to a "patently unreliable" camera system. ECF 307 (Trial Transcript, 10/22/19), at 141.

In any event, even assuming that counsel's decision not to object constituted a serious error, I do not see any basis on which to conclude that, but for counsel's (hypothetical) error, there is a reasonable probability that the outcome of the trial would have been different. Therefore, I am not persuaded that counsel's supposed error caused prejudice to defendant.

In sum, as to defendant's claim that counsel's failure to object to the prosecutor's questioning of ATF Specialist Greene constituted ineffective assistance, defendant satisfies neither prong of the *Strickland* standard.

Defendant's second asserted ground for relief is that trial counsel provided ineffective assistance by failing to present expert testimony "regarding the contents of the DVD containing the video surveillance footage of the fire." *Id.* at 21. Although defendant's presentation of this ground is less than pellucid, defendant appears to contend that such testimony would have confirmed that the hard drives containing surveillance footage did, in fact, fail. *See id.* at 20–21.

In my view, counsel's decision not to present expert testimony "regarding the contents of the DVD containing the video surveillance footage of the fire," *id.* at 21, does not constitute a violation of professional norms. To support the defense theory that the surveillance system's hard drives failed at some point after the fire, defense counsel presented testimony from Blazer Catzen, "an expert in digital forensics and computer systems." ECF 304 (Trial Transcript, 10/16/19), at 171. Catzen testified that "[h]eat is an enormous factor" in causing hard disk failure. *Id.* at 176. He also testified that a hard disk on which new information is frequently saved, such as a hard disk used to store surveillance footage, is more likely to fail than a "low . . . volume" hard drive. *Id.* at

175; *see id.* at 174.  Further, Catzen explained that a hard drive "only will read and write," that is,

allow a user to save and access information, "a certain number of times" before failing.  *Id.* at 174.

Defense Counsel's decision to substantiate the defense theory regarding hard drive failure

with the testimony of Catzen "fall[s] within the 'wide range of professionally competent

assistance.'" *Buck*, 580 U.S. at 118 (citation omitted).  In essence, defendant's claim is that another

expert could have made the same point as Catzen, except more persuasively.  But, "'*Strickland*

does not guarantee perfect representation, only a reasonably competent attorney.'"  *Cox*, 102 F.4th

663, 675 (4th Cir. 2024) (quoting *Harrington*, 562 U.S. at 110) (cleaned up).  In any event, it is

not reasonably probable that, but for the omission of the additional expert testimony contemplated

by defendant, the outcome of the trial would have been different.

Defendant's third asserted ground for relief is that trial counsel provided ineffective

assistance "by admitting to the jury [that defendant was guilty with respect to] Count Three" during

closing argument.  *Id.* at 27.  Count Three charged that defendant committed wire fraud by causing

GGG to submit false information regarding the Adcor surveillance system to Travelers, "including

that the system was damaged and needed to be repaired at a cost of approximately $30,000."  ECF

94, ¶ 8.

In particular, defendant asserts that, at closing argument, his lawyer provided an

"inaccurate . . . factual account" by stating, ECF 307 (Trial Transcript, 10/22/19), at 150:

> You also heard that Ed Cameron met with people at Adcor, specifically not Jimmy,
> to discuss getting a bid to replace the system.  As a result of that meeting, Mike
> Hyatt went to Jimmy and asked if he could get a bid.  Jimmy said yes.  Mr. Hyatt
> got the bids, sent them to Randy Goodman asking how to proceed.

And, defendant argues that counsel "went so far as to hand over the case to the government

by admitting" Count Three, by stating, *id.* at 157:

They also tried to replace the security system.  The government just criticized them for not upgrading and not integrating, but that's what they were trying to do under the policy, to protect the property.

I readily conclude that neither of these comments amounts to ineffective assistance of counsel under *Strickland.*  Defendant's main defense to Count Three was that he did not authorize submission of the new security system bid to Travelers and, therefore, could not have specifically intended to defraud Travelers by the submission of that bid.  *See* ECF 229 at 16.  In pressing this defense, counsel chose not to dispute that Stavrakis approved the *solicitation* of a bid to replace the security and surveillance systems.  *See id.* at 15.  But, counsel argued that defendant never directed submission of the bid, explicitly or tacitly, to Travelers.  *Id.* at 16–17.  Counsel's decision to concede that Stavrakis approved the solicitation of the bid, but to dispute that he later approved its submission to Travelers, was not objectively unreasonable.

Defense counsel also reasonably chose to concede that the bid submitted to Travelers "represented [an] upgrade[] from the previous systems."  *Id.* at 18.  Counsel observed that the "camera system bid" stated, on its face, "that it included six new cameras, and that the security system, swipe card entry system, and camera systems would all be integrated."  *Id.*  And, counsel argued that, "[o]n these points, there can be no claim at all that there was an intent to defraud, because the [bid was] . . . true and accurate on [its] face."  *Id.*  It was not objectively unreasonable for counsel to argue that the system described in the bid was so obviously an upgrade that defendant could not have acted with fraudulent intent by causing it to be submitted.  Counsel's concession at closing argument that Adcor "tried to . . . upgrad[e] and integrat[e]" the security system was part of this line of reasonable argument.  ECF 307 (Trial Transcript, 10/22/19), at 157.  I do not see a basis on which to conclude that this concession resulted in ineffective assistance of counsel.

In any event, the comments about which Mr. Stavrakis complains were not prejudicial under *Strickland*.  In particular, defendant has provided no reason to believe that, but for these concessions, there is a reasonable probability that the jury's decision as to Count Three would have been different.

Mr. Stavrakis's fourth claim of ineffective assistance of counsel is that "[a]ppellate counsel's legal arguments and erroneous account of the facts pertaining to Count Three . . . and to the willful blindness instruction . . . resulted in representation" that was "ineffective and prejudicial" to his defense.  ECF 406 at 27.  Defendant appears to argue that appellate counsel provided ineffective assistance by failing to argue, on appeal, that trial counsel's defense of Count Three was ineffective.  However, I have concluded that trial counsel did not provide ineffective assistance of counsel with respect to Count Three.  It follows that appellate counsel did not provide ineffective assistance of counsel by declining to argue on appeal that trial counsel's advocacy with respect to Count Three was ineffective under the Sixth Amendment.

Defendant's fifth claim of ineffective assistance of counsel concerns trial counsel's seeming description of defendant as an "'otherwise law-abiding citizen.'"  *Id.* at 33 (quoting ECF 307, Trial Transcript, 10/22/19, at 113).  In particular, defendant claims that "the jury would have understood [counsel] to have [made] . . . an admission of guilt" when counsel stated, during closing argument: "'But the government wants you to believe things were so bad that this otherwise law-abiding citizen was so desperate that he was going to set fire to a business that he'd spent a lifetime building.'"  ECF 406 at 33 (quoting ECF 307, Trial Transcript, 10/22/19, at 113).

This claim is plainly without merit.  Context makes clear that, in the comment, counsel was characterizing *the government*'s argument regarding Stavrakis's motive.  Counsel then argued to

the jury that the government's motive argument, so characterized, was incredible. *See* ECF 307

(Trial Transcript, 10/22/19), at 113–14:

> And somehow the government bizarrely suggests that Mr. Stavrakis's respect and admiration for his father and the legacy of the company he started would have driven him to burn it down. That suggestion is absurd.

Trial counsel's decision to characterize, and then criticize, the government's motive

argument was not professional incompetence.  Nor did it cause defendant prejudice under

*Strickland*.

In sum, none of defendant's five claims of ineffective assistance of counsel is viable.  I

turn now to defendant's claims of prosecutorial misconduct.

## B.  Prosecutorial Misconduct

Defendant has identified eight purported instances of prosecutorial misconduct.

First, defendant claims that the prosecutor[10] committed misconduct by eliciting testimony

from ATF Specialist Greene that "erroneously [led] the jury to believe" that surveillance footage

recorded at the time of the fire had been deliberately withheld from the government.  ECF 406 at

7; *see id.* at 5–7 (citing ECF 292,Trial Transcript, 9/17/10, at 118).

Second, defendant argues the prosecutor committed misconduct by eliciting testimony

from ATF Special Agent McKinnies "that there was no handle or latch allowing the roof hatch to

be opened from the outside."  ECF 406 at 7.  According to defendant, it was improper to elicit this

testimony because Agent McKinnies "had no motivation to take notice of or to document the

handle and latch on the outside of the roof hatch" during his inspection of the premises.  *Id.* at 8.

---

[10] The government was represented at trial by two attorneys.  However, for convenience, I shall refer generically to "the prosecutor."

Third, defendant claims that the prosecutor committed misconduct by eliciting testimony from Anthony Cianferano, a firefighter and one of the first responders to the scene, that the front door of the building was unlocked when he arrived to ventilate the building. *Id.* at 8–10. According to defendant, Cianferano's testimony is contradicted by surveillance video of the front door, which shows that it took "three seconds" for Cianferano to open a supposedly unlocked door. *Id.* at 9.

Fourth, defendant claims that the prosecutor committed misconduct by eliciting false testimony from Detective Reno that surveillance footage of the site of the fire showed a human figure igniting the fire. *Id.* at 11–14.

Fifth, defendant claims that the prosecutor committed misconduct by suggesting, during the redirect examination of Adcor employee Michael Hyatt, that an arson had previously been committed at Adcor. *Id.* at 14–15 (citing ECF 298, Trial Transcript, 9/26/19, at 112). In particular, defendant complains of the following colloquy, ECF 298 at 112:

> [PROSECUTOR]: Mr. Levin asked you questions about prior times when hard drives had crashed. Do you recall those questions?
>
> [HYATT]: Yes.
>
> [PROSECUTOR]: And during any of those prior times, did they proceed [sic] an arson or did they follow, immediately after an arson?
>
> [HYATT]: No, they did not.[11]
>
> [PROSECUTOR]: And did any of them follow immediately after an arson where there was a can of flammable liquid found at the spot where the arson started?

---

[11] The answer is completely unclear because the question was a compound one, and it is not apparent whether Hyatt answered "No, the crashing of the hard drives did not *precede* an arson," or, rather, "No, the crashing of the hard drives did not *follow* an arson."

Defendant asserts, ECF 406 at 15:  "According to this line of questioning (either by design or otherwise) logically the jury could only have understood that [the] prosecutor . . . testified that another arson occurred prior to the arson that is the subject of this case."

Sixth, defendant claims that the prosecutor committed misconduct by suggesting during closing argument that certain questions posed by defendant to Adcor employees on the morning of the fire established that defendant had "guilty knowledge of the fire."  *Id.* at 27 (citing ECF 307, Trial Transcript, 10/22/19, at 180).

Seventh, defendant claims that the prosecutor committed misconduct by stating during closing argument that the circumstances of the arson were inconsistent with defendant's theory that the arson was an act of revenge by a disgruntled former employee.  ECF 406 at 30–31 (citing ECF 307, Trial Transcript, 10/22/19, at 75).   According to defendant, the prosecutor was "testifying to his opinion on the matter of the motive which is a question solely for the jury to decide."  ECF 406 (July 28, 2023, Motion to Vacate), at 30.

Eighth, defendant claims that the prosecutor committed misconduct by "insinuat[ing]" during closing argument that defendant "is in some way connected to drug trafficking in meth." ECF 406 (July 28, 2023, Motion to Vacate), at 32.

Defendant did not raise any claim of prosecutorial misconduct on direct appeal.  *See* Opening Brief of Appellant (Dkt. No. 36), *United States of America v. Stavrakis*, No. 20-4149 (4th Cir. Oct. 1, 2020); Petition for Writ of Certiorari, *Stavrakis v. United States of America*, No. 22-205 (Sept. 2, 2022).  Yet, in the Motion for Acquittal (ECF 229), defendant identified three purported instances of prosecutorial misconduct.

First, defendant argued that "the government knowingly presented false evidence to the jury through the testimony of Trey Radtke."  *Id.* at 20.  Second, defendant asserted that "the

government failed to correct the record when Det[ective] Reno . . . denied," falsely, "that he was suspended for having received overtime pay while umpiring a baseball game." *Id.* at 21. And, third, defendant claimed that, "in its closing argument, the government argued facts not in evidence." *Id.* In particular, defendant wrote, *id.*:

> The government told the jury that two of the hard drives recovered from Adcor could not have been the "missing hard drives" that were the subject of testimony by, *inter alia*, Mike Hyatt, because they had been recovered from another location at Adcor. In fact, there was no such evidence presented at trial.

However, the Motion for Acquittal did not discuss any of the eight instances of prosecutorial misconduct alleged in the Petition. *Compare* ECF 229 *with* ECF 406. Instead, Stavrakis has presented these claims for the first time in the Petition. Defendant acknowledges as much in the Reply. *See* ECF 419 at 16, 17. He states, *id.* at 16: "All the claims raised pursuant to this motion are distinct from those raised in earlier proceedings . . . ." And, he asserts that "none [of the seventeen grounds for relief] have been raised in any prior proceeding." *Id.* at 17.

Because the prosecutorial misconduct claims have been presented for the first time in the Petition, they are subject to procedural default, unless Stavrakis can excuse the default by demonstrating cause and prejudice or actual innocence. *See Green*, 67 F.4th at 666; *Stuckey v. United States*, MOC-15-569, 2016 WL 1532430, at *4 (W.D.N.C. Apr. 15, 2016) ("[B]ecause Petitioner has raised this prosecutorial misconduct theory for the first time in his motion under Section 2255, it is subject to a procedural bar unless Petitioner can demonstrate either cause and prejudice or actual innocence.").

I readily conclude that defendant cannot make the requisite showing. Defendant has not even asserted that the default of his prosecutorial misconduct claims can be excused by their novelty. *Cf. Green*, 67 F.4th at 666 ("[C]ause exists when the defaulted claim was so novel that its legal basis [was] not reasonably available to counsel.") (first alteration added) (citation and

internal quotation marks omitted).  Moreover, defendant's two claims of "actual innocence," *see* ECF 406 at 11, 16, are specious.

As noted, a federal habeas petitioner may assert a "gateway" claim of actual innocence to overcome a procedural bar to review.  *Schlup*, 513 U.S. at 326.  In particular, "a credible showing of actual innocence may allow a prisoner to pursue his constitutional claims . . . on the merits notwithstanding the existence of a procedural bar to relief," thus creating a "gateway" through which the petitioner may pass to allow the Court the reach the merits of his otherwise barred claims.  *Id.* at 392.

To present a credible gateway claim of actual innocence under *Schlup*, a petitioner must present "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S at 324.  "A petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror acting reasonably would have voted to find him guilty beyond a reasonable doubt."  *Id.* at 329.

Defendant claims that "newly discovered evidence [of] brown masking tape" found "in the photograph taken at 4:39am by ATF SA Herb of the front office doors (Gov. Exhibit A-1) . . . proves that the arsonist did not enter through the front office doors."  *Id.* at 11.  And, defendant asserts, *id.* at 16:

> [N]ewly discovered evidence establishes that the hard drives [containing surveillance footage] did in fact fail, and their inexplicable disappearance was not part of a cover-up.  This newly discovered evidence consists of the contents of the DVD created containing a copy of the 24 hours of surveillance footage surrounding the fire at Adcor (see Gov. Exhibit 1) and the testimony contained in the trial transcript."

However, the "new" evidence defendant identifies—namely, "Gov. Exhibit A-1" and "Gov. Exhibit 1"—was, in fact, presented at trial.  *See* ECF 218 (Government's Exhibit List) at 1,

17. Therefore, this evidence is not "new" within the meaning of *Schlup*. It follows that actual innocence does not provide a basis to excuse the default of defendant's prosecutorial misconduct claims.

Nonetheless, in the Reply, defendant suggests that his appellate counsel provided constitutionally ineffective assistance of counsel by failing to pursue, on appeal, "any of the claims raised in [defendant's] Section 2255 motion." ECF 419 at 51. Mindful of defendant's pro se status, I construe this statement as an assertion that ineffective assistance of appellate counsel provides cause to excuse the default of defendant's prosecutorial misconduct claims.

Whether appellate counsel provided ineffective assistance by failing to assert the prosecutorial misconduct claims now before the Court depends, in part, on whether these claims are meritorious.

"To prevail on a claim of prosecutorial misconduct, a defendant must show (1) that the prosecutor's remarks and conduct were, in fact, improper and (2) that such remarks or conduct prejudiced the defendant to such an extent as to deprive the defendant of a fair trial." *United States v. Allen*, 491 F.3d 178, 191 (4th Cir. 2007) (citing *United States v. Golding*, 168 F.3d 700, 702 (4th Cir. 1999)). Habeas relief is available for prosecutorial misconduct only when the prosecutor's conduct is so egregious in the context of the entire trial that it renders the trial fundamentally unfair. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citation omitted). A claimant must show that the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *United States v. Lightly*, 616 F. 3d 321, 359 (4th Cir. 2010) (quoting *United States v. Wilson*, 135 F. 3d 291, 297 (4th Cir. 1998)).

In my view, none of the claims of prosecutorial misconduct asserted by defendant is viable. I consider each claim, in turn.

First, the prosecutor's questioning of ATF Specialist Greene, reviewed earlier, did not constitute prosecutorial misconduct.  As an initial matter, the questioning was not improper.  And, as noted, by answering "Yes" to the final question in the series of questions about which defendant complains, ATF Specialist Greene affirmed that he would *not* "be able to tell just from examining the DVD . . . .if there were places where there was just simply no file in the first place."  ECF 292 (Trial Transcript, 9/17/19), at 290–91.  Such an affirmation could not have prejudiced defendant, because it was consistent with defendant's claim that the missing surveillance videos were not intentionally deleted.

Second, the prosecutor did not commit misconduct by eliciting testimony from ATF Special Agent McKinnies "that there was no handle or latch allowing the roof hatch to be opened from the outside."  ECF 406 at 7.  Defendant asserts that, at the time of Agent McKinnies's search of the Adcor facility, "the investigators were not considering any other point of entry other than the front office doors."  *Id.* at 8.  Therefore, in defendant's view, Agent McKinnies lied (ECF 406 at 7) when he testified that he "didn't see any handle or any mechanism to open [the roof hatch] from the exterior."  ECF 293 (Trial Transcript, 9/18/19), at 88.  I see no basis for defendant's assertion that Agent McKinnies lied about his observations regarding the roof hatch.  And, in any event, a prosecutor does not commit misconduct by presenting a witness whose credibility is contested.

The jury was well aware of defendant's concerns regarding the reliability of investigators' testimony about the roof hatch.  At closing argument, defendant's counsel argued, ECF 307 (Trial Transcript, 10/22/19), at 115:

> The government's case against Jimmy Stavrakis depends entirely upon the arsonist having entered Adcor through the front door. That assumption that they've made has colored this entire investigation. The government was quick to assume the arsonist came through the front door. As a result, they didn't even consider the

possibility that someone came through another point of entry, like the roof hatch. If they had, Task Force Officer Hodges would have gone up to the roof. He would have checked for fingerprints around the latch. He would have realized that there was a latch. He would have inspected the roof hatch and he would have discovered there was no lock. He would have discovered how easily someone could have come through the hatch and defeat the security system.

Defendant's "prosecutorial misconduct" claim regarding the presentation of Agent McKinnies's testimony is, in effect, a renewal of defense counsel's closing argument to the jury about the roof hatch. The law of prosecutorial misconduct protects a defendant from a trial rendered "fundamentally unfair" by a prosecutor's impropriety. *Darden*, 477 U.S. at 170. It does not provide a license to relitigate credibility determinations by a jury with which a defendant disagrees. "The jury heard the testimony, including the cross examination, weighed the evidence, including the reliability of the witnesses, and convicted" defendant. *United States v. Briscoe*, 101 F.4th 282, 299 (4th Cir. 2024).

Mr. Stavrakis's third and fourth claims of prosecutorial conduct concern the prosecutor's presentation of allegedly false testimony by Anthony Cianferano, a Baltimore City firefighter, and Detective Reno, respectively. *See* ECF 406 at 8–10 (Cianferano); *id.* at 11–14 (Detective Reno). Each of these two claims, like defendant's claim with respect to Agent McKinnies's testimony, is, in effect, a request that the Court correct a determination of credibility by the jury with which defendant disagrees. Defendant's claims of prosecutorial misconduct with respect to the testimony of Cianferano and Detective Reno are without merit.

Defendant's fifth claim of prosecutorial misconduct concerns the prosecutor's questioning of Michael Hyatt, described *supra*. *See* ECF 298 (Trial Transcript, 9/26/19), at 112. As noted, the prosecutor asked Hyatt: "[D]id any of [the previous hard drive failures] follow immediately after an arson where there was a can of flammable liquid found at the spot where the arson started?" *Id.*

Defendant asserts that the prosecutor's questions implied that "another arson occurred prior to the arson that is the subject of this case."  ECF 406 at 15.

I disagree that the prosecutor's question, and those preceding it, carried such an implication.  These questions were apparently designed to emphasize to the jury that the alleged hard drive failure of July 30, 2015, *unlike* previous drive failures, occurred at a time when the lost surveillance footage could have helped investigators identify the perpetrator of a major crime.  In other words, the prosecutor attempted to distinguish the circumstances of the failure of July 30, 2015.

By contrasting the seemingly suspicious circumstances of the hard drives' "failure" on July 30, 2015, with the circumstances of past failures, the government invited the jury to conclude that the drives' alleged "failure" was, in fact, part of a deliberate scheme to destroy inculpatory surveillance footage.  Such an argument depended for its persuasiveness on the assumption that past hard drive failures were *not* preceded by "another arson [that] occurred prior to the arson that is the subject of this case."  ECF 406 at 15.

Moreover, defense counsel objected when the prosecutor asked Hyatt whether any previous hard drive failures "follow[ed] immediately after an arson where there was a can of flammable liquid found at the spot where the arson started."  ECF 298 (Trial Transcript, 9/26/19), at 112.  The Court agreed that the prosecutor's question was "argumentative."  *Id.*  Any objectionable "argument" contained in the prosecutor's question was not that previous arsons had occurred at Adcor.  Instead, it was that the suspicious circumstances of the alleged hard drive "failure" suggested that it was part of a scheme to destroy inculpatory surveillance footage.

In sum, the prosecutor did not suggest that previous arsons had occurred at Adcor. Therefore, defendant's fifth claim of prosecutorial misconduct is groundless.

As indicated, in defendant's sixth claim of prosecutorial misconduct, he asserts that the prosecutor improperly suggested during closing argument that certain questions posed by defendant to Adcor employees on the morning of the fire established that defendant had "guilty knowledge of the fire." ECF 406 at 27 (citing ECF 307, Trial Transcript, 10/22/19, at 180). In particular, defendant complains of the following comments by the prosecutor during closing, ECF 307 at 180:

> One of the questions, the defendant asks him a couple questions. He says, was anybody using the methanol in the DNC hut? And Ed Thomas, that kind of struck him as odd. And then the next question, was anybody smoking in the DNC Hut? Those questions show you that the defendant knew that the DNC Hut was the area of the fire and that the methanol had been found in there. Why is he even asking those questions? They're just sort of ridiculous.

I discern no impropriety in these comments. At closing argument, a prosecutor may encourage the jury to draw certain inferences from the evidence. The use of terms such as "odd" and "ridiculous" is well within the bounds of acceptable advocacy. *Cf. Jordan v. Bishop*, JKB-2021 WL 4483000, at *7 (D. Md. 2021) ("[C]haracterization of defense counsel's arguments as 'manipulation' of the evidence is simply advocacy on the part of the prosecutor."). The closing argument defendant complains of was neither improper nor unduly prejudicial and, therefore, does not provide a basis for relief.

Defendant's seventh claim of prosecutorial misconduct is that the prosecutor committed misconduct by stating during closing argument that the circumstances of the arson were inconsistent with defendant's theory that the arson was an act of revenge by a disgruntled former employee. ECF 406 at 30–31 (citing ECF 307, Trial Transcript, 10/22/19, at 75). As noted, a prosecutor is entitled during closing argument to encourage the jury to draw certain inferences from the evidence. The prosecutor's attempt to do so here does not amount to misconduct.

Defendant's final claim of prosecutorial misconduct is that the prosecutor improperly "insinuate[d]" during closing argument that defendant "is in some way connected to drug trafficking in meth." ECF 406 at 32. According to defendant, this objectionable insinuation occurred when the prosecutor stated: "But right away, [the investigators'] suspicions are very much aroused about what they're seeing and they have observed because this methanol drug (sic) is in a place where it really should not be." ECF 307 (Trial Transcript, 10/22/19), at 173. Defendant's assertion to this effect approaches frivolousness. It was undisputed that a drum of methanol was used to ignite the fire. And, counsel for the government has represented to the Court that the audio recording of the argument establishes that the prosecutor said "drum." ECF 418; ECF 418-1 (email from court report to counsel confirming that the prosecutor said "drum," not "drug").

In sum, none of defendant's prosecutorial misconduct claims is viable. As a result, appellate counsel did not render ineffective assistance of counsel by failing to assert these claims on direct appeal. It follows that ineffective assistance of counsel does not provide a basis for excusing the procedural default of defendant's prosecutorial misconduct claims. I have already concluded, *supra*, that the default of defendant's prosecutorial misconduct claims cannot be excused on grounds of novelty or actual innocence. Therefore, defendant's prosecutorial misconduct claims are subject to procedural default. Finally, even assuming *arguendo* that defendant's prosecutorial claims are not defaulted, they are without merit and do not provide a basis for relief, for the reasons provided above.

### C. Due Process

In a section with the heading "Due Process Violation," defendant asserts: "The trial court committed prejudicial error in violation of Mr. Stavrakis's due process right with respect to Count

Three . . . both (1) by denying the defense's motion for acquittal (and renewed motion) finding there was substantial evidence of guilt, and (2), contrary to the defense's objection, by instructing the jury to willful blindness."  ECF 406 at 22.

In the Motion for Acquittal, defendant argued that the government had failed to present sufficient proof that defendant submitted the bid to Travelers with fraudulent intent.  ECF 229 at 14–20.  And, defendant asserted that the Court "erred in submitting a willful blindness instruction to the jury."  *Id.* at 20.

The Court addressed defendant's assertions regarding the sufficiency of the government's proof and the propriety of the willful blindness instruction in the Memorandum Opinion of February 7, 2020.  ECF 247 at 17–22; *id.* at 22 n.12.  In particular, the Court concluded that the government had presented sufficient proof of intent to defraud, *id.* at 21–22, and that the willful blindness instruction "was generated by the evidence."  *Id.* at 22 n.12.  On appeal, defendant renewed his arguments regarding the government's proof of intent to defraud and the propriety of the willful blindness instruction.  *See Stavrakis*, 2022 WL 563242, at *6–7.  After considering these arguments, the Fourth Circuit affirmed defendant's judgment of conviction.  *Id.* at *8.

As mentioned, "it is well-settled that [a defendant] cannot 'circumvent a proper ruling . . . on direct appeal by re-raising the same challenge in a § 2255 motion.'"  *Dyess*, 730 F.3d at 360 (quoting *Linder*, 552 F.3d at 396) (ellipsis in *Dyess*); *see Caro*, 733 F. App'x at 659 (same).  Defendant's arguments in the Petition regarding the sufficiency of the government's proof of intent to defraud and the propriety of the willful blindness instruction are substantially the same as the

arguments previously made to, and rejected by, this Court, and then the Fourth Circuit on direct appeal. Therefore, they cannot provide a basis for relief under § 2255.

### D. Jury Instruction

Defendant asserts: "The trial court by failing to instruct the jury on the definition or specific intent, a required element of Counts Two and Three . . . denied Mr. Stavrakis his right to have the jury decide each and every element of the offense he is charged with and violated his right to due process." ECF 406 at 33.

With regard to the intent element of Counts Two and Three, the Court's instructions to the jury provided, in part, ECF 308 (Trial Transcript, 10/23/19), at 52: "[I]n order to sustain the charges against the defendant, the government must establish beyond a reasonable doubt that he knew that his conduct as a participant in the scheme was calculated to deceive and, nonetheless, he associated himself with the alleged fraudulent scheme *for the purpose of causing some loss to another*." (Emphasis added).

"General intent crimes require only that the act be done 'voluntarily and intentionally, and not because of mistake or accident.'" *United States v. Ducore*, 312 F. Supp. 3d 535, 537 (E.D. Va. 2018) (quoting *United States v. Blair*, 54 F.3d 639, 642 (10th Cir. 1995)). "By contrast, specific intent crimes require that a defendant act 'not only with knowledge of what he is doing, but [also] with the objective of completing some unlawful act.'" *Ducore*, 312 F. Supp. 3d at 537 (quoting *Blair*, 54 F.3d at 642. The Court instructed the jury that, to sustain the charges in Counts Two and Three, the government was required to prove beyond a reasonable doubt that defendant acted "for the purpose of causing some loss to another." ECF 308 (Trial Transcript, 10/23/19), at 52.

In my view, such an instruction accurately describes the requirement of specific intent. Therefore, I do not see any basis for defendant's assertion that the Court "fail[ed] to instruct the jury on the definition of specific intent." ECF 406 at 33.

### E.  Motion for Appointment of Counsel

Defendant has also asked the Court to appoint a lawyer to represent him in connection with the Petition. ECF 405.

There is no Sixth Amendment right to counsel in collateral proceedings. *See Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987). A court may appoint counsel for a pro se litigant seeking relief under § 2255 if the court determines "that the interests of justice so require." 18 U.S.C. § 3006(a)(1)(B). Rule 8(c) of the Rules Governing Section 2255 Proceedings for the United States District Courts provides that a court must appoint counsel "[i]f an evidentiary hearing is required."

In my view, Stavrakis capably articulated the legal and factual basis of his claims for relief. Moreover, his claims are not unduly complicated, and no evidentiary hearing is required. Therefore, the interests of justice do not require the appointment of counsel to represent Stavrakis in connection with the Petition. Accordingly, I shall deny the Motion. ECF 405.

### F.    Discovery Request

As noted, defendant has filed a Discovery Request in connection with the Petition. ECF 425.

In support of his claim that the prosecutor presented perjured testimony, defendant seeks various documents concerning Agent McKinnies, Anthony Cianferano, and Detective Reno, such as transcripts of their grand jury testimony and records of investigatory interviews in which they were participants. *Id.* at 2–4. With respect to defendant's claims of actual innocence, defendant requests "[a]ll photographs and video footage of the front office doors taken on the day of the fire,"

*id.* at 4, and a "copy of the DVD containing the video surveillance footage from the night of the fire." *Id.* Defendant also "requests leave from the Court to obtain the services of an expert in the internal operations of and interactions among the various software programs and hardware devices that comprise a computer system . . . who can determine whether there was and the extent of the physical deterioration of the harddrives [sic] just prior to their failure." *Id.*

With respect to his claim that the Court committed a "due process violation," *id.* at 5, "by denying the defense's motion for acquittal" and "instructing the jury to willful blindness," ECF 406 at 22, defendant "requests for [sic] the deposition of Randolf Goodman." ECF 425 at 5. In particular, defendant seeks to ask Goodman whether "it [was] Ed Cameron who originally informed him about the request for proposal regarding the Adcor security system needed for the building repair estimate," and whether Goodman "pass[ed] that request on to" defendant. *Id.* Defendant also seeks to depose Cameron, in order to ask him "[w]ho at Adcor first told him that the security system was not working" and to whom "he originally communicate[d] his need for a proposal regarding the Adcor security system." *See id.*

Rule 6(a) of the Rules Governing Section 2255 Proceedings provides, in part: "A judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of discovery." And, Rule 6(b) of the Rules Governing Section 2255 Proceedings provides: "A party requesting discovery must provide reasons for the request. The request must also include any proposed interrogatories and requests for admission, and must specify any requested documents." Good cause exists when "'specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief . . . .'" *Bracy v. Gramley*, 520 U.S. 899, 908–09 (1997) (quoting *Harris v. Nelson*, 394 U.S. 286, 300 (1969)).

Some of the requested items would have been produced by the government in discovery, such as grand jury transcripts of testimony by persons who testified at trial.  Moreover, defendant was a client of Goodman.  Presumably, defendant's lawyer had the ability to interview Goodman prior to trial.   In any event, the allegations set forth in the Petition and Discovery Request provide no basis for concluding that, if allowed discovery, defendant might be able to demonstrate that he is entitled to relief.  Therefore, I shall deny the Discovery Request.

## V.    Certificate of Appealability

Pursuant to Rule 11(a) of the Rules Governing Proceedings under 28 U.S.C. § 2255, the court is required to issue or deny a certificate of appealability ("COA") when it enters a final order adverse to the applicant.  A COA is a "jurisdictional prerequisite" to an appeal from the court's earlier order. *United States v. Hadden*, 475 F.3d 652, 659 (4th Cir. 2007).  In other words, unless a COA is issued, a petitioner may not appeal the court's decision in a § 2255 proceeding.  28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b).[12]

A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see Buck*, 580 U.S. at 114.  When the court denies a petitioner's motion on its merits, a petitioner satisfies this standard by demonstrating that reasonable jurists would find the court's assessment of the constitutional claims debatable or wrong. *See Tennard v. Dretke*, 542 U.S. 274, 282 (2004); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also Miller-El v. Cockrell*, 537 U.S. 322, 336–38 (2003).

Stavrakis has not made a substantial showing that his constitutional rights were denied. Therefore, I decline to issue a COA.

---

[12] The denial of a COA by the district court does not preclude Stavrakis from seeking a COA from the Fourth Circuit.

### VI.    Conclusion

For the foregoing reasons, I shall deny the Petition (ECF 406), the Motion (ECF 405), and

Discovery Request (ECF 425).  I shall not issue a COA.

An Order follows, consistent with this Memorandum Opinion.

Date: July 3, 2024                                        _____/s/_____

                                                                    Ellen Lipton Hollander
                                                                    United States District Judge